UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                   )
KEVIN COOPER,                      )    No. C06-1365RSL
                                   )
                    Plaintiffs,    )
         v.                        )
                                   )    ORDER GRANTING DEFENDANTS'
UNIVERSITY OF WASHINGTON, *et al.*,)    MOTION FOR SUMMARY
                                   )    JUDGMENT
                    Defendants.    )
_____)

This matter comes before the Court on "Defendants' Motion for Summary Judgment" on all of plaintiff's claims. Dkt. # 11. Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude the entry of judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the non-moving party's position is not

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

sufficient," however, and factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995).

Taking the evidence presented in the light most favorable to plaintiff and having heard the arguments of counsel, the Court finds as follows:

In February 2001, plaintiff, an employee of the University of Washington's Computing and Communications Department ("C&C"), used his University e-mail account to send what can charitably be described as a vulgar and aggressive e-mail to the United Way. After a United Way representative complained about the e-mail, the University issued a letter of counsel to Mr. Cooper regarding his inappropriate use of University resources. A month later, plaintiff received a favorable performance review and, on July 25, 2001, a raise.

In September 2001, Mr. Cooper made a complaint to Human Resources in which he alleged that his career at C&C was over because:

- a co-worker had distributed a harsh critique of Mr. Cooper's work on July 12, 2001;
- his supervisor refused to address this criticism;
- he was perceived differently at C&C after it became known that he had sent the February 2001 e-mail to the United Way; and
- he did not get an interview for a position at C&C's Student Systems Information Services.

At the time of these complaints, Mr. Cooper had already obtained a position at the University's Medical Center Information Systems ("MCIS"): he announced his resignation from C&C on September 28, 2001, shortly after meeting with the human resources representative. Four days

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT         -2-

later, plaintiff was placed on Home Assignment for the duration of his two week notice period and his access to the University mainframes and development machines was cut off. Apparently as a result of a miscommunication, plaintiff's University e-mail account was also closed. Although this mistake was rectified almost immediately, plaintiff lost most of his e-mails. To make matters worse, when Mr. Cooper started his new job with MCIS, his employment records were not transferred and he was assigned a "hire date" of October 15, 2001, rather than the date on which he first began working for the University in 2000. This error took considerable time and effort on the part of plaintiff and an MCIS payroll employee to resolve, but Mr. Cooper was ultimately credited with and paid for 275.99 hours of accrued vacation time.

On November 26, 2001, Mr. Cooper requested that the University Complaint Investigation and Resolution Office ("UCIRO") investigate his allegations that C&C had discriminated, harassed, and retaliated against him. In his request, Mr. Cooper again mentioned the four items raised with Human Resources in September 2001. He also challenged his supervisor's decision to place him on Home Assignment insofar as the decision reflected an unfounded concern that Mr. Cooper might become physically violent and/or pose a risk to the University's computer systems. Finally, Mr. Cooper demanded to know why he was forced out of his office as if he had been fired and why his e-mail account, which contained e-mails that would support his claim of discrimination, had been deleted.

On June 28, 2002, UCIRO issued its Report of Investigation, concluding that Mr. Cooper's allegations were unfounded. Mr. Cooper took particular issue with the part of the report that addressed his objection to being classified as a threat or risk. In that section, the investigator recounted two workplace incidents. The first involved Mr. Cooper's e-mail response to the criticisms of his co-worker, Tim McAllister. The investigator found these e-mails disquieting and noted that Mr. Cooper's intent was unclear. The second event involved Mr. Cooper's September 28, 2001, meeting with Ron Boerger, the human resources

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          -3-

representative. During the UCIRO investigation, Mr. Boerger reported that Mr. Cooper was agitated enough at the beginning of their September 28th meeting that Mr. Boerger mentally calculated whether he could get to the door of his office should the situation escalate. Although the investigator noted that these incidents were ambiguous as far as Mr. Cooper's actual intent was concerned, UCIRO concluded that the University had acted reasonably in response to an uncertain situation and that plaintiff's Home Assignment was not retaliatory.

Mr. Cooper took great offense at what he perceived as unsupported allegations of violence. He began sending e-mails to Mr. Boerger demanding an explanation for what he told the UCIRO investigator. At Mr. Cooper's request, Amanda Paye, the Human Resource manager, did an investigation to determine whether Mr. Boerger violated any workplace rules or policies in his handling of the September 28, 2001, meeting. Ms. Paye determined that Mr. Boerger did not violate a policy or performance expectation.

Through the summer and fall of 2002, Mr. Cooper continued to contact University employees in an attempt to correct his hire date and recover his lost vacation benefits. Mr. Cooper asserted that the payroll problem, and his inability to have it corrected in a timely manner, were caused by Mr. Boerger and/or C&C as retaliation for the initial September 28, 2001, complaint to Human Resources. In a post script to a December 5, 2002, e-mail, Mr. Cooper writes: "Ron Boerger: You are a classless liar for what you did to me. You must be incredibly thankful that Amanda covered it up for you." On December 11, 2002, the University's Compensation Office confirmed that Mr. Cooper was hired in 2000 and that he was entitled to vacation benefits throughout his term of employment.

For reasons that are not clear from the record, the University's suspension of football coach Rick Neuheisel prompted another round of e-mails from Mr. Cooper in June 2003. This time, he addressed the e-mails to Mr. Boerger, Ms. Paye, Mike Keller (the UCIRO investigator), the President of the University, and The Daily (the campus newspaper). Mr.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT            -4-

Cooper suggested that Ms. Paye should "sick that LYING PIG BOERGER on slick Rick! Have Ron do ANOTHER hatchet job! Rick is a big fish, so maybe you need to do the hatchet job Amanda. God knows you have all the skills! . . . When it comes to RETALIATION, YOU GUYS ARE THE BEST!" Mr. Cooper also edited the privilege notice below his signature block to state: "Also, RON BOERGER and AMANDA PAYE are LYING PIGS! (WHOOPS, I ALMOST FORGOT MIKE KELLER)." In a second e-mail addressed to "Ron and morally depraved UCIRO employees," Mr. Cooper sarcastically noted that "I assume that I still hold the title of most 'violent' employee on campus. I wear it with honor."

Mr. Boerger, Ms. Paye, and Mr. Keller all raised concerns regarding these e-mails and Ms. Paye requested that Mr. Cooper's conduct be discussed at the workplace violence assessment meeting scheduled for that Friday. After concluding that the e-mails were harassing, if not threatening, the assessment committee recommended that Mr. Cooper's employment be terminated for violation of the workplace violence policy and that he be barred from the University campus. The recommendation was conveyed to Tom Martin, the appointing authority for Mr. Cooper's position, who asked to review the e-mails. Mr. Martin was shocked by the content of the e-mails and concurred with the committee's recommendation. Mr. Cooper's employment was terminated on June 19, 2003, and he was prohibited from entering the campus of the University of Washington or Harborview Medical Center except to seek emergency medical care. Mr. Cooper requested and obtained two levels of review of his termination: the decision to dismiss Mr. Cooper was affirmed at both levels. This action was filed in state court on August 16, 2006.

**(1) Retaliatory Discharge and/or Failure to Hire in Violation of RCW 49.60.210**

The Washington Law Against Discrimination ("WLAD") makes it an unfair practice "for any employer . . . to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden in this chapter . . . ." RCW 49.60.210(1).

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT           -5-

To prove his claim of retaliation, plaintiff must show that (a) he opposed a practice forbidden by the WLAD, (b) there was an adverse employment action taken, and (c) retaliation was a substantial factor motivating the adverse action. See, e.g., Davis v. West One Automotive Group, 166 P.30 807, 813 (Wn. App. Aug. 30, 2007). Once a *prima facie* case of retaliation is presented, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. Renz v. Spokane Eye Clinic, P.S., 114 Wn. App. 611, 618 (2002). Plaintiff bears the ultimate burden of persuasion, however, and must raise an inference of retaliation to withstand a motion for summary judgment. If the employer identifies a legitimate, non-retaliatory reason for the termination, plaintiff must rebut the employer's explanation by showing that the proffered reason (a) has no basis in fact or (b) even if based in fact, was not actually the motivating factor or (c) would be insufficient to motivate the adverse employment action given the surrounding circumstances. Chen v. State, 86 Wn. App. 183, 190 (1997).

The first element of a retaliation claim is opposition to a practice forbidden by the WLAD. Simply utilizing an employer-provided complaint process is not enough: the complaint must challenge an event or practice made unlawful by the WLAD. An employee who opposes an activity that is not, in fact, an unlawful employment practice will be protected from retaliation only if "the opposition is based on a reasonable belief that the employer has engaged in an unlawful employment practice." EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1012 (9th Cir. 1983). See also Graves v. Dep't of Game, 76 Wn. App. 705, 712 (1994) ("[A]n employee who opposes employment practices reasonably believed to be discriminatory is protected by the 'opposition clause' whether or not the practice is actually discriminatory.").

Plaintiff's claim of retaliation is based on the September 2001 complaint in which plaintiff objected to a co-worker's critique of his work and his supervisor's refusal to address the criticism, complained that he was perceived differently at C&C after it became known that he had sent the February 2001 e-mail to the United Way, and asserted that these two events had

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT           -6-

cost him a position at C&C's Student Systems Information. None of the events about which plaintiff complained constitutes an unlawful employment practice under the WLAD, however, and no reasonable person could think otherwise. During all times relevant to this case, the WLAD prohibited employers from discriminating on the basis of "age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal . . . ." The WLAD does not insulate employees from adverse performance reviews or prohibit employment decisions based on characteristics other than those specified in the statute. Plaintiff has not provided any theory or argument that could transform Mr. McAllister's criticism of plaintiff's work, or his supervisor's alleged acquiescence therein, into unlawful discrimination.

The only protected characteristics identified by plaintiff in his opposition to defendants' motion for summary judgment are "sexual orientation" and "creed." The WLAD was amended in 2006 to add "sexual orientation" as a protected characteristic. Because discrimination based on sexual orientation was not an unfair practice at the time these events transpired, the Court need not consider plaintiff's strained claim that he was somehow complaining about sexual orientation discrimination. With regards to his "creed" argument, plaintiff maintains that any action taken against him because of the message conveyed in the United Way e-mail (such as the failure to interview him for the Student Systems job) constitutes discrimination based on creed. Thus, plaintiff argues, he was opposing a practice forbidden by the WLAD when he complained to Human Resources in September 2001.

Not wishing to repeat in this order the highly offensive and abusive language found in Mr. Cooper's e-mail to the United Way, the parties are invited to reread the e-mail, in its entirety, at this point. Plaintiff argues that the message contained in the e-mail is a statement of his "creed" against child molestation. The term "creed" is not defined in the statute and must therefore be given its ordinary, dictionary meaning. See, e.g., Burns v. City of Seattle, 161

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT           -7-

1   Wn.2d 129, 141 (2007).  "Creed" is generally understood as a brief, authoritative statement of
2   principles or beliefs formally expressed and sincerely maintained.  See, e.g., Webster's Third
3   New International Dictionary at 533.  There is nothing brief, authoritative, or formal about Mr.
4   Cooper's February 2001 e-mail.  Nor does the e-mail convey a positive message of belief or
5   statement of principles regarding child molestation:  it is nothing but an ugly, expletive-laced,
6   diatribe against homosexuals and homosexuality.  Although the WLAD must be liberally
7   construed (RCW 49.60.020), it should not be interpreted so expansively as to sweep within the
8   term "creed" every statement of opinion or belief to which the proponent is committed.  "Creed"
9   must be interpreted in the context of the statute as a whole and together with the related terms
10  "age, sex, marital status, race . . .,color, national origin, or the presence of any sensory, mental,
11  or physical disability or the use of a trained dog guide or service animal."  Burns, 164 P.3d at
12  481.  The qualities and characteristics protected by the WLAD are not of a transient, changing
13  type and are generally not dependent on the whim of the possessor.  The term "creed" should
14  not, therefore, be interpreted to capture individual convictions and opinions which, while
15  strongly held today, could alter after reasoned argument or a change in circumstances.  Such a
16  construction would not further the purposes of the statute – namely the prevention and
17  elimination of discrimination in Washington – and would instead protect from censure any and
18  all opinions as long as they are firmly held.

19         Mr. Cooper's attempt to label his vitriolic and bigoted attack on gay men in
20  general and the United Way in particular as a "creed" is absurd and no reasonable person could
21  believe that such a diatribe was protected activity under the WLAD.  As for Mr. Cooper's failure
22  to obtain an interview for the Student Systems position, he has made no attempt to show that
23  C&C's decision to hire someone else was based on a protected characteristic.  His argument has
24  always been that Mr. McAllister's criticism and/or the United Way e-mail poisoned his
25  supervisors' minds against him, making it unlikely that he would be able to advance within
26  
ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT            -8-

C&C. Because an employee's work performance and unprotected speech can be considered by an employer when making hiring decisions, Mr. Cooper has not shown that he opposed any unlawful employment practice and has not, therefore, made out a *prima facie* case of retaliation.[1]

Even if the Court were to assume for purposes of this motion that the University's consideration of the United Way e-mail and/or Mr. McAllister's criticisms could be considered discriminatory, defendant has identified a legitimate, non-discriminatory, non-retaliatory reason for Mr. Cooper's discharge. Based on the record presented by the parties, what ultimately cost Mr. Cooper his job was his intemperate response to the revelation that Mr. Boerger felt that Mr. Cooper posed a potential threat. As summarized by Ms. Paye:

> Kevin was very upset about that particular comment and I talked with him several times about it. Since then, we've heard from Kevin about every few months with e-mails about how "evil" Ron and I are. We have deliberately decided to let them go in the past.
>
> Ron and I are a bit more concerned about this one – for Kevin to equate a TOTALLY unrelated situation to Ron and me is a concern. Also, each time he contacts us, it seems that his characterization of Ron's response/involvement becomes more extreme and outside the realm of what actually occurred.

Decl. of Bruce Heller (dated Aug. 16, 2007), Ex. 22. Ms. Paye was concerned enough about the June 2003 e-mails that she changed her home contact information in the University's computer system to a post office box. Mr. Keller, the UCIRO investigator who Mr. Cooper called a "lying pig" and "morally depraved," expressed his trust in the workplace violence assessment system but said he would keep his door locked for a while if the committee concluded that no action

---

[1] In his November complaint to UCIRO and thereafter, Mr. Cooper alleged that he was put on Home Assignment, had his e-mails deleted, was deprived of his vacation benefits, and was accused of potentially threatening behavior in retaliation for filing his September 2001 complaint with Human Resources. As discussed above, the September 2001 complaint was not protected activity because none of the events described constituted, or could reasonably be thought to constitute, discrimination under the WLAD. Because none of Mr. Cooper's complaints involved employment practices made unlawful by the WLAD, there could be no retaliatory discharge or failure to hire under the statute. See Graves, 76 Wn. App. at 712.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT         -9-

was necessary.  Given the fact that Mr. Cooper's interactions with certain University employees were becoming more aggressive and less reasonable over time, the workplace violence assessment committee could reasonably conclude that Mr. Cooper was harassing fellow employees in violation of the University of Washington Policy and Procedure on Workplace Violence.  After reviewing the June 2003 e-mails, Mr. Martin, the appointing authority for Mr. Cooper's position, agreed with the committee's recommendation and terminated Mr. Cooper's employment.

        Plaintiff attempts to show that the University's concerns regarding workplace harassment were merely pretext and that he was actually being forced out of his job to punish him for complaining about Mr. Boerger and C&C.  Mr. Cooper argues that the University has offered "fundamentally different justifications" for his firing.  There is no evidence from which one could find any inconsistencies, much less a "fundamental" inconsistency.  According to the letter of termination, the appointing authority, and the human resources consultant, Mr. Cooper was fired for sending harassing e-mails in violation of the workplace violence policy.  The only contrary statement identified by plaintiff is a response to an inquiry regarding unemployment benefits in which the human resources consultant states that Mr. Cooper was fired for an "error of judgment/failure to meet communication standards."  This explanation, while exceptionally generous to Mr. Cooper, is an accurate characterization of Mr. Cooper's conduct and, although using different language, does not constitute a "fundamentally different justification" for the adverse employment action.[2]

        Plaintiff also argues that other University employees engaged in similar conduct but were not terminated or barred from the University campus.  It is clear from the evidence provided that Mr. Simonsen's conduct was not sufficiently similar to provide a fair comparison.

---

[2] Because there is no evidence that the members of the workplace violence assessment committee harbored a discriminatory animus toward plaintiff, the issue of Mr. Martin's independence or lack thereof when reviewing the committee's recommendation is irrelevant.

By all accounts, Mr. Simonsen's anger was aimed at a third party, not a co-worker, and the fact that he may have used profanity in discussing this situation with a supervisor does not give rise to an inference that the supervisor was in any way harassed or intimidated.[3] With regards to Mr. McAllister's behavior, there is no evidence that his harassing and intimidating behavior was ever brought to the attention of Human Resources or UCIRO.  Although Mr. Benson was clearly uncomfortable with Mr. McAllister's conduct, the record shows that the matter was handled within his workgroup and resulted in a letter of reprimand from his manager.  When Mr. Benson heard of other employees who had similar trouble with Mr. McAllister, he declined to get involved and was unable to convince them that they should complain to more senior management.  Mr. Cooper's conduct, by contrast, was brought to the attention of Human Resources and UCIRO because the harassing and intimidating conduct was aimed at employees therein who took the step of requesting a workplace violence assessment.  Plaintiff has failed to show that Mr. Simonsen and Mr. McAllister were similarly situated and has failed to rebut the employer's legitimate, non-retaliatory justification for the adverse employment action.

### (2) Wrongful Discharge in Violation of Public Policy

Plaintiff argues that his termination violated Washington's public policies against retaliation and the improper withholding of wages.  To succeed on his claim of wrongful discharge in violation of public policy, plaintiff must establish four necessary elements: (a) that a clear public policy exists; (b) that discouraging the conduct in which Mr. Cooper engaged would jeopardize the public policy; (c) that the public-policy-linked conduct caused the dismissal; and (d) that defendants have not presented an overriding justification for the dismissal.  Roberts v. Dudley, 140 Wn.2d 58, 64-65 (2000).  While it is clear that the WLAD provides the foundation for a public policy prohibiting adverse employment action for opposing

---

[3] To the extent Mr. Simonsen's conduct mirrored Mr. Cooper's conduct, they were treated similarly:  the use of University resources, namely their e-mail accounts, to harass third-parties with coarse language was investigated and resulted in counseling.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT         -11-

discrimination in the workplace, Washington courts have been cautious when applying the public policy exception to the at-will employment doctrine. The exception is a narrow one and will generally be applied "only when offensive conduct would otherwise go unredressed." Blinka v. Wash. State Bar Ass'n, 109 Wn. App. 575, 586 (2001). Mr. Cooper's claim of retaliation for opposing discrimination falls within the scope of the WLAD, and plaintiff should not be permitted to do an end run around the elements of the statute by asserting a tort claim for the same conduct.

Even if such an end run were allowed, plaintiff is unable to satisfy the second, third, and fourth elements of his public policy claim. Discouraging complaints such as Mr. Cooper's would not jeopardize the public policy against discrimination. Mr. Cooper complained that his supervisors did not like him because of the opinions expressed in the United Way e-mail and/or because Mr. McAllister criticized his work. Such complaints do not involve discrimination based on any characteristic protected by the WLAD and discouraging such complaints would have no effect on the public policy against discrimination. As discussed above, defendant had a legitimate, non-discriminatory, non-retaliatory justification for terminating plaintiff's employment and barring him from the University's campus because it reasonably believed that plaintiff's reaction to what he considered unwarranted attacks on his work ethic and character violated the University's workplace violence policy. Plaintiff cannot, therefore, establish a causal nexus between his complaints and his termination.

Mr. Cooper also argues that the University discharged him for complaining about the unlawful withholding of his wages or other benefits. Assuming RCW 49.52 *et seq*. establishes a clear public policy against the withholding of accrued vacation benefits, plaintiff has failed to raise a genuine issue of material fact regarding a violation of the statute: his allegations of intent, a necessary element of a claim under RCW 49.52.050, are not only unsupported but contradicted by his acknowledgment that a University employee worked diligently to correct his employment records and recover the lost vacation hours. In addition,

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT            -12-

plaintiff has failed to raise an inference that his complaints regarding his lost vacation benefits, as opposed to his harassment of co-workers, caused his termination.  His claim of wrongful discharge in violation of public policy fails as a matter of law.

**(3) Section 1983**

Plaintiff asserts that the charges which resulted in his termination and banning were so defamatory that the University was obligated to provide him with a pre- or post-termination hearing to clear his name.  The publication of stigmatizing charges in the process of dismissing a public employee triggers due process protections.  See Board of Regents v. Roth, 408 U.S. 564, 573 (1972).  A charge is "stigmatizing" if the character and circumstances of the allegation are such as "might seriously damage [plaintiff's] standing and associations in his community" or may "foreclose[] his freedom to take advantage of other employment opportunities."  Paul v. Davis, 424 U.S. 693, 709-10 (1976).  To establish a right to a name-clearing hearing, an employee must also show that "(1) the accuracy of the charge is contested; (2) there is some public disclosure of the charge; and (3) the charge is made in connection with termination of employment."  Mustafa v. Clark County Sch. Dist., 157 F.3d 1169, 1179 (9th Cir. 1998) (*quoting* Matthews v. Harney County, 819 F.2d 889, 891-92 (9th Cir. 1987)).

There is a split in the circuits regarding whether the publication element is satisfied if the employer limits dissemination to its own internal departments and processes.  See Olivieri v. Rodriguez, 122 F.3d 406, 408 (7th Cir. 1997) (listing cases).  The Ninth Circuit has not addressed this issue, but the Court finds that the rule adopted in the First, Third, and Seventh Circuits – that plaintiff must show that defendant publicized to the community or potential employers the grounds for plaintiff's dismissal – is preferred.  Such a rule ensures that liability under § 1983 arises only where the state, rather than plaintiff or a third party, has caused the constitutional violation.  Communications within the University designed to implement the workplace violence policy and enforce the termination and bar decisions cannot, therefore, satisfy the publication element.  Nor is there any evidence that the University disclosed the

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT             -13-

grounds for plaintiff's discharge to any third party.  In fact, plaintiff argues in another context that the University's response to a third party's inquiry regarding unemployment benefits was so watered down as to be untruthful.  Permitting a constitutional claim where the University has not publicized the grounds of the dismissal would vitiate the at-will doctrine and raise constitutional concerns regarding virtually every employment decision.  There being no publication to third parties, plaintiff's § 1983 claim fails as a matter of law.[4]

### (4) Blacklisting in Violation of RCW 49.44.010

In his complaint, plaintiff alleges that the University has "wrongfully caused to be published false and/or materially misleading statements regarding plaintiff's character and/or conduct for the purpose of preventing plaintiff from obtaining employment within or outside of the University of Washington in violation of RCW 49.44.010."  Complaint at ¶ 7.2.  The statute cited by plaintiff precludes wilful and malicious "blacklisting" and provides criminal penalties for such conduct.  Assuming for purposes of this motion that this criminal statute is a sufficient basis for a civil action on behalf of the person injured (see Dick v. N. Pac. Ry. Co., 86 Wash. 211, 221 (1915)), plaintiff has not shown that the University published the grounds for his dismissal (see above) or otherwise circulated his name to prospective employers for the purpose of preventing plaintiff from securing employment.  Plaintiff seems to argue that the University's refusal to rehire him constitutes "blacklisting."  Neither the historic circumstances that gave rise to the statutory ban on blacklisting nor the relevant case law supports plaintiff's claim that he was "blacklisted" simply because his former employer refused to rehire him.  The Court declines plaintiff's invitation to expand the reach of RCW 49.44.010 beyond what is commonly understood by the term "blacklisting."

---

[4] In a footnote, plaintiff asserts a First Amendment claim based on his termination and banning.  Response at 23 n.7.  No argument or explanation is given in support of this claim and the Court will not consider it further.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT            -14-

**(5)  Wrongful Discharge in Violation of Promises Contained in Manuals**

Plaintiff argues that the University's policies and manuals contained promises that he could complain without fear of retaliation and that he could get an independent supervisory review of the adverse employment action.  Plaintiff makes no attempt to explain why the Court should convert these promises into a public policy on which a tort claim for wrongful discharge could be based.  If the University breached an enforceable promise, a contract claim should have been asserted.  Otherwise, this second iteration of plaintiff's wrongful discharge claim fails because he has not identified an underlying public policy.

**(6) Tortious Interference with Business Expectancy and/or Relationships**

Plaintiff did not respond to the University's motion for summary judgment on this claim.  Because the University cannot interfere with its own business relationships and no improper purpose for the bar order was shown, this claim fails as a matter of law.

For all of the foregoing reasons, defendant's motion for summary judgment as to all of plaintiff's claims is GRANTED.

Dated this 8th day of November, 2007.

*Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT            -15-